Hand-Delivered

FILED          1
CHARLOTTE, NC

SEP 24 2025

US DISTRICT COURT
WESTERN DISTRICT OF NC

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

| | | |
|---|---|---|
| MELANIE STROUD, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:25-CV-733 |
| | ) | |
| v. | ) | |
| | ) | COMPLAINT FOR VIOLATIONS OF THE |
| COCA-COLA CONSOLIDATED, INC., | ) | AMERICANS WITH DISABILITIES ACT, |
| | ) | FAMILY AND MEDICAL LEAVE ACT, |
| Defendant. | ) | COBRA, ERISA, AND STATE LAW |
| | ) | WITH DEMAND FOR JURY TRIAL |
| | ) | |

**TO THE HONORABLE COURT:**

Plaintiff Melanie Stroud, appearing pro se, respectfully files this Complaint against Defendant Coca-Cola Consolidated, Inc., and alleges as follows:

## I. NATURE OF THE ACTION

1. This is a civil action brought under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"), the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1161 et seq. ("COBRA"), the Employee Retirement Income Security Act, 29 U.S.C. § 1132 ("ERISA"), and North Carolina common law.

2. Plaintiff seeks monetary and equitable relief for employment discrimination, retaliation, failure to accommodate, FMLA interference, COBRA/ERISA violations, wrongful termination, and intentional infliction of emotional distress.

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(4) because Plaintiff's claims arise under federal statutes including the ADA, FMLA, COBRA, and ERISA.

4. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367, as they arise from the same nucleus of operative facts.

5. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant maintains its principal place of business at 4100 Coca-Cola Plaza, Charlotte, NC 28211, and a substantial part of the events giving rise to Plaintiff's claims occurred within this District.

## III. PARTIES

6. Plaintiff Melanie Stroud is a citizen and resident of Mecklenburg County, NC, residing at 8508 Westhope Street, Charlotte, NC 28216.

7. Defendant Coca-Cola Consolidated, Inc. is a corporation organized under Delaware law with its principal place of business at 4100 Coca-Cola Plaza, Charlotte, NC 28211. Defendant is an "employer" within the meaning of the ADA, FMLA, COBRA, and ERISA, employing more than 15 employees.

8. Defendant may be served through its registered agent: CT Corporation System, 160 Mine Lake Ct Ste 200, Raleigh, NC 27615-6417.

## IV. ADMINISTRATIVE EXHAUSTION AND TIMELINESS

9. Plaintiff filed a timely charge of discrimination with the EEOC on June 1, 2023 (Charge No. 430-2023-02738), and received a Right to Sue letter dated June 30, 2025.

10. This action is filed within 90 days of receipt, with the filing deadline of September 28, 2025.

11. Under the continuing violation doctrine established in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), all discriminatory acts from

June 2022 through December 16, 2022 are actionable as they constitute a single, continuous course of disability-based harassment culminating in Plaintiff's unlawful termination.

12. FMLA, COBRA, and ERISA claims do not require EEOC exhaustion.

## V. FACTUAL ALLEGATIONS

### A. Employment and Performance Excellence

13. Plaintiff began working at Defendant's Charlotte facility on August 17, 2020, initially as a contract employee through Associate Staffing. In July 2021, Plaintiff was hired as a direct, permanent employee of Defendant Coca-Cola Consolidated, Inc., and continued in this capacity until her termination on December 16, 2022. Throughout her employment, Plaintiff worked as a Collections/Accounts Receivable Representative working remotely from Charlotte, North Carolina.

14. Plaintiff's performance was exemplary throughout both her contract and permanent employment. Defendant's decision to hire Plaintiff as a permanent employee in July 2021 after eleven months demonstrates their satisfaction with her work. Under the supervision of Marlin La Salle from August 2020 through June 2022, Plaintiff received excellent performance feedback. In August 2021, customers praised Plaintiff as "the best person...in over two years," and Plaintiff received performance awards and recognition throughout her tenure under La Salle's management.

15. Prior to discrimination beginning, Plaintiff had arranged to shadow Franky Campbell in the Sales Department, representing significant career advancement opportunity that was derailed by the discriminatory conduct described below.

16. The contrast between supervisors is stark and legally significant. Under Marlin La Salle's supervision from August 2020 through June 2022, Plaintiff experienced no disciplinary issues, received customer praise, and was selected for career advancement opportunities. The discriminatory targeting began immediately upon LaTonya Franklin's assumption of supervisory duties in June 2022, demonstrating that Plaintiff's disability status, not job

performance, was the motivating factor for the adverse treatment that followed.

## B. Disabilities and Substantial Limitations

17. Plaintiff was diagnosed with lupus in 2017 and disclosed this diagnosis to Defendant in December 2020 while working as a contract employee. Defendant was therefore aware of Plaintiff's disability when they made the decision to hire her as a permanent employee in July 2021. In July 2022, Plaintiff was diagnosed with situational anxiety and panic disorders, and later with major depressive disorder.

18. Plaintiff's conditions substantially limit major life activities including: (a) working – requiring extended medical leave with documented inability to perform essential job functions; (b) concentrating – causing documented inability to focus during work tasks; (c) immune function – lupus as an autoimmune condition; and (d) communicating – panic attacks triggered by workplace phone calls.

19. On July 21, 2022, Plaintiff's treating physician documented that Plaintiff scored 17 on the GAD-7 assessment, indicating "Severe, very likely to have an anxiety disorder," with "moments where she is not able to focus at all."

20. On November 11, 2022, Dr. Payton documented work-related stress with specific symptoms including anxiety, depression, and sleep disturbance, establishing clinical causation between workplace conduct and Plaintiff's deteriorating condition.

## C. Corporate Knowledge and Deliberate Indifference

21. Prior to Franklin's promotion to supervisor in June 2022, she worked as Plaintiff's coworker and was fully aware of Plaintiff's lupus diagnosis. Plaintiff had openly discussed her lupus condition in the workplace, and Franklin had complete knowledge of Plaintiff's disability status before assuming any supervisory authority.

22. Franklin's promotion occurred despite known workplace hostility issues. Upon learning that Franklin would become their supervisor, coworkers Quanda

Ellington and Jennifer Jackson resigned their positions rather than work under Franklin's supervision, citing concerns about workplace hostility.

23. Defendant's decision to promote Franklin to a supervisory position despite employee resignations and known interpersonal problems demonstrates deliberate indifference to employee welfare and created a foreseeable risk of discriminatory conduct against disabled employees like Plaintiff.

24. Franklin's immediate targeting of Plaintiff upon becoming supervisor was not coincidental but represented a deliberate choice to act on preexisting discriminatory animus toward Plaintiff's disability status, which Franklin had observed and been aware of during their prior coworker relationship.

25. Upon information and belief, Franklin's discriminatory conduct toward Plaintiff was part of a broader pattern of targeting employees under her supervision. The systematic nature of problems under Franklin's management is evidenced by multiple employee resignations upon her promotion and continuing terminations using pretextual justifications similar to those employed against Plaintiff. The mass exodus of employees upon Franklin's promotion, combined with continuing reports of problematic conduct and subsequent terminations using similar pretextual reasons, demonstrates that Defendant's promotion of Franklin created a foreseeable risk of systematic discrimination that materialized exactly as employees had feared.

26. Corporate knowledge of Franklin's problematic conduct was confirmed when former employee Quanda Ellington sent an email directly to HR representative Molly Dubble on October 21, 2022—less than two months before Plaintiff's termination. Ellington specifically warned HR that Franklin was "harsh and abrasive when speaking to others" and that she "can only imagine how that may have progressed to be even worse with given the supervisor title." Ellington described how Franklin's conduct created such a "toxic" work environment that it caused physical symptoms including "headaches, anxiety, blurred vision," forcing her resignation. Despite receiving direct warnings from former employees about Franklin's toxic conduct and its physical impact on workers, Defendant failed to investigate, monitor, or remediate Franklin's behavior. Instead, Defendant allowed Franklin to continue her pattern of

harassment, resulting in Plaintiff's discriminatory termination just weeks after receiving explicit notice of Franklin's problematic supervision and its health impacts on employees.

27. The systematic nature of Franklin's discriminatory conduct is demonstrated by consistent employee reports of physical and mental health deterioration under her supervision, including Quanda Ellington's "headaches, anxiety, blurred vision" requiring resignation, and Plaintiff's panic attacks, heart palpitations, and work-related anxiety disorders, all directly caused by Franklin's hostile conduct.

**D. Discriminatory Targeting and Hostile Work Environment**

28. Beginning in June 2022, when LaTonya Franklin became Plaintiff's supervisor replacing Marlin La Salle, Franklin immediately began targeting Plaintiff based on her disabilities through a pattern of discriminatory conduct including:

**28A.** On June 22-23, 2022, Plaintiff encountered legitimate airline delays during personal travel, which unexpectedly extended into her scheduled work time. She promptly notified her supervisor, Clay Wright, via Microsoft Teams, and also informed her coworker, Karrington Thompson, via text. Despite these timely communications, LaTonya Franklin threatened to classify her absence as a "no call, no show" and warned that she would "accrue an occurrence"—a disciplinary measure not customarily applied within Plaintiff's department. On June 24, Franklin escalated the situation by demanding documentation of "all travel tickets" during a disciplinary phone call. The call caused Plaintiff to suffer a severe panic attack, witnessed by her family member Carmen Brooks, involving uncontrollable crying, rapid breathing, shaking, and an inability to speak coherently for nearly an hour. This incident illustrates the immediate physical impact of Franklin's conduct on Plaintiff's anxiety-related medical condition.

28C. Franklin's threat to falsely document Plaintiff's legitimate absence as a "no call no show" despite contemporaneous evidence of Plaintiff's communication efforts demonstrates a pattern of retaliatory documentation that would later culminate in Plaintiff's termination based on similarly

fabricated "FMLA paperwork" issues. This incident established Franklin's willingness to create false disciplinary records against Plaintiff and her deliberate disregard for accurate record-keeping when targeting disabled employees.

29. Franklin's discriminatory comments, including "She doesn't look crazy to me" (made in the presence of coworkers like Karrington Thompson while viewing Plaintiff's Facebook page during Plaintiff's FMLA leave) and "She was acting crazy and was not mentally impaired," were particularly egregious given Franklin's long-standing knowledge of Plaintiff's lupus condition and recent mental health struggles. Franklin's invasive conduct extended to viewing Plaintiff's personal Facebook page while Plaintiff was on FMLA leave in August 2022 and making discriminatory comments about Plaintiff's appearance and mental health to coworkers, further demonstrating her obsessive focus on Plaintiff's disability status and deliberate violation of Plaintiff's privacy during protected medical leave.

30. Work Assignment Removal: On October 4, 2022, Franklin removed work assignments from Plaintiff, telling her she did it so Plaintiff "wouldn't get a headache or panic," directly referencing Plaintiff's medical conditions.

31. Systematic Isolation: On September 22, 2022, upon Plaintiff's return from FMLA leave, Franklin held a meeting instructing all AR department employees not to talk to or help Plaintiff.

32. On November 8, 2022, Franklin engaged in further harassment regarding Plaintiff's bereavement leave for a deceased aunt. Despite Plaintiff having already taken the leave and returned to work, Franklin harassed Plaintiff about providing documentation that had not been required for previous bereavement leaves or for other employees. When Plaintiff questioned why she was being subjected to different standards, Franklin replied "BECAUSE I CAN," demonstrating arbitrary and discriminatory enforcement of policies. During this phone call, witnessed by third-party Angela Webster, Franklin repeatedly interrupted Plaintiff, raised her voice, and hung up on Plaintiff when

Plaintiff attempted to respond, causing Plaintiff to experience a panic attack with heart palpitations and difficulty breathing.

### E. FMLA Leave and Accommodation Requests

33. Plaintiff took FMLA leave from July 7, 2022 through September 21, 2022, administered by Reed Group, Defendant's third-party administrator.

34. In September 2022, Plaintiff made an initial inquiry to human resources requesting removal from Franklin's supervision due to disability-related workplace harassment, but received no response for over two months.

35. On November 9, 2022, Plaintiff contacted Reed Group directly to inquire about reasonable accommodation procedures. Reed Group advised Plaintiff that she needed to exhaust her available FMLA leave before reasonable accommodations could be processed, and informed Plaintiff of her remaining leave balances. Following this guidance, Plaintiff scheduled a medical appointment for November 11, 2022, specifically to request additional FMLA leave as a prerequisite to formal accommodation requests.

36. On November 11, 2022, Plaintiff requested a second FMLA leave and notified Supervisor Franklin, Manager Clay Wright, and Reed Group of her need for leave from November 15-22, 2022.

37. On November 14, 2022, Plaintiff was forced to communicate with HR through David O'Connell rather than directly with Franklin due to Franklin's hostile conduct, stating she did not feel "comfortable or safe" communicating with her supervisor. In her November 16, 2022 follow-up email, Plaintiff documented her growing "anxiety and concern" about being kept in secrecy regarding matters affecting her, and reminded HR that her September 2022 request to be removed from Franklin's supervision remained unanswered after two months.

38. Plaintiff took the second FMLA leave from November 15-22, 2022.

39. On December 6, 2022, HR representative Molly Dubble contacted Plaintiff via Microsoft Teams to inform her that the "investigation" into Franklin's conduct had been closed and that Franklin would receive "training." During this call, witnessed by a non-employee third party, Plaintiff verbally

requested reasonable accommodation to be transferred to another supervisor's team. Dubble promised to send Plaintiff information about reasonable accommodation procedures but never provided this information. This conversation occurred just ten days before Plaintiff's termination, demonstrating that Defendant chose termination over exploring readily available accommodations.

**F. Reed Group Timeline and Corporate Promises**

40. Critical Timeline:

• December 5, 2022: Reed Group initially denied Plaintiff's continued FMLA leave for "lack of certification."

• December 12, 2022, 7:39:49 PM: Plaintiff successfully faxed complete, detailed FMLA medical certification forms to Reed Group (5 pages, Job 20491, Result: Success).

• December 12, 2022, 4:08 PM: HR Business Partner Angenella Fleming, copying Senior Manager Clay Wright, acknowledged Plaintiff's upcoming December 16, 2022 medical appointment at 3:10 PM and stated Defendant could "anticipate updated information to accurately process your claim."

• December 13, 2022: Reed Group reversed the denial and provided Plaintiff with a new deadline of December 27, 2022 to submit additional documentation.

• December 14, 2022: Reed Group sent additional clarification request regarding leave type discrepancy (continuous vs. reduced leave) but confirmed the certification was being processed and provided forms for healthcare provider completion.

• December 16, 2022, Morning: Plaintiff spoke by telephone with Reed Group Case Worker Phil Controulis, who confirmed that the December 14 clarification form was to be completed by Plaintiff's healthcare provider during the 3:10 PM medical appointment scheduled for that same day.

• December 16, 2022, 9:30 AM: Clay Wright terminated Plaintiff for alleged "FMLA paperwork" issues—just three days after Reed Group approval, one day after Reed Group provided clarification forms, 5.5 hours before Plaintiff's promised medical appointment, and hours after Reed Group confirmed the process was moving forward normally.

41. The December 14, 2022 Reed Group correspondence (Exhibit Q-1) demonstrates that Reed Group was actively working to resolve minor clarification issues and had extended Plaintiff's deadline to December 27, 2022. The clarification request concerned only whether Plaintiff needed "continuous" or "reduced" leave type designation—a minor administrative detail that Reed Group routinely resolves through healthcare provider input. Reed Group's provision of specific forms for completion during Plaintiff's December 16 medical appointment, combined with Case Worker Phil Controulis's morning telephone call confirming the process, establishes that Reed Group considered Plaintiff's case to be progressing normally toward approval, not toward any punitive action.

42. Upon information and belief, Defendant has claimed the December 14, 2022 Reed Group correspondence was "sent by mistake," but has produced no evidence that Reed Group rescinded this correspondence before or after Plaintiff's termination. Under established legal precedent, official correspondence from third-party administrators creates legitimate expectations for employees regarding FMLA processes. Defendant cannot rely on unsubstantiated claims of "mistake" to justify terminating an employee who was reasonably relying on official Reed Group communications providing extended deadlines and clear completion procedures. The absence of any rescission notice before termination demonstrates that Plaintiff was entitled to rely on Reed Group's December 14 correspondence as the operative status of her FMLA case. Defendant's post-termination claim that Reed Group's December 14, 2022 correspondence was sent "by mistake"—without any evidence of rescission before termination—demonstrates Defendant's willingness to terminate employees based on incomplete or unverified information regarding their FMLA rights, further evidencing the pretextual nature of the termination decision.

## G. Available Accommodations Ignored

43. Reed Group portal documentation shows Defendant had extensive unused accommodation options available at the time of termination: ADA Leave Available: Unlimited (Used: 0 weeks); Personal Leave Available: 30 days (Used: 0 days); Personal Administrative Leave: 30 days (Used: 0 days); Total unused options: 60+ days plus unlimited ADA accommodation.

44. Despite these available alternatives, Defendant chose the most punitive action—termination—rather than exploring any reasonable accommodations.

## H. False Statements to Government Agencies

45. Following termination, Defendant's representatives made false statements under penalty of perjury to government agencies. In January 10, 2023 unemployment response to Agent 5852, ADP representative Emily Darabcsek made material false statements under oath: "We have no record of an appeal submitted" and "We have no record of appeal submitted to the third party, nor record of an FMLA decision being overturned from Reed Group." These false statements directly contradict documented evidence, including: (1) Reed Group's December 13, 2022 reversal of the initial denial; (2) Reed Group's December 14, 2022 clarification request with extended December 27 deadline; (3) Reed Group Case Worker Phil Controulis's December 16, 2022 morning phone call confirming active case processing; and (4) Reed Group's December 27, 2022 email showing the denial had been overturned and leave was approved from November 15-22, 2022, demonstrating willful disregard for FMLA requirements under McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988).

## I. Continuing Post-Termination Interference

46. The false statements to unemployment agencies demonstrate Defendant's continuing pattern of interference with Plaintiff's statutory rights even after termination. By denying under oath that Reed Group had approved Plaintiff's FMLA leave, Defendant prevented Plaintiff from receiving unemployment compensation during her period of financial vulnerability, compounding the economic harm from the unlawful termination.

47. As a direct result of Defendant's false statements to unemployment agencies, Plaintiff was denied unemployment compensation benefits during her most vulnerable period following termination, causing additional financial distress during Plaintiff's recovery from work-related mental health conditions.

## J. COBRA Violation and Emotional Distress

48. Following termination on December 16, 2022, Plaintiff was entitled to receive COBRA election notice within 44 days under 29 U.S.C. § 1166(a). Defendant has never provided any COBRA notice.

49. From January 29, 2023 through filing, statutory penalties under 29 U.S.C. § 1132(c) exceed $104,000 at $110 per day and continue to accrue daily.

50. As a result of Defendant's conduct, Plaintiff's health severely deteriorated. She placed 8-12 calls to suicide hotlines between December 2022 and February 2023, required community crisis intervention, attended group counseling, and was diagnosed with Major Depressive Disorder.

## VI. CLAIMS FOR RELIEF

### COUNT I: DISABILITY DISCRIMINATION UNDER THE ADA

51. Plaintiff incorporates all preceding paragraphs by reference.

52. Plaintiff is a qualified individual with disabilities within the meaning of the ADA who could perform essential job functions with reasonable accommodation.

53. Defendant took adverse employment actions against Plaintiff, including Franklin's discriminatory comments, work assignment removal based on disability, systematic isolation, and ultimate termination.

54. Under the Fourth Circuit's "but-for" causation standard established in Gentry v. East West Partners Club Mgmt. Co., 816 F.3d 229 (4th Cir. 2016), Plaintiff's disabilities were the but-for cause of the adverse treatment, as evidenced by terminating Plaintiff for "FMLA paperwork" from dates Reed Group had approved as protected leave.

## COUNT II: FAILURE TO ACCOMMODATE UNDER THE ADA

55. Plaintiff incorporates all preceding paragraphs by reference.

56. Plaintiff requested reasonable accommodations supported by medical documentation, including flexible schedule, modified breaks, and workplace modifications.

57. Defendant failed to engage in the interactive process required under 29 C.F.R. § 1630.2(o)(3) and terminated Plaintiff before any meaningful accommodation analysis, despite documentation showing 60+ days of unused leave and unlimited ADA accommodation available.

## COUNT III: ADA RETALIATION

58. Plaintiff incorporates all preceding paragraphs by reference.

59. Plaintiff engaged in protected activity by requesting reasonable accommodations under the ADA on November 9, 2022, and December 6, 2022.

60. The temporal proximity between protected activity and termination (10 days from December 6 request), combined with the pretextual termination reason, establishes but-for causation under the Fourth Circuit standard.

## COUNT IV: FMLA INTERFERENCE

61. Plaintiff incorporates all preceding paragraphs by reference.

62. As detailed in paragraphs 40 and 45, Defendant interfered with Plaintiff's FMLA rights by terminating Plaintiff for "FMLA paperwork" issues despite Reed Group approval and making false statements to government agencies regarding Plaintiff's FMLA status.

63. The contradiction between Reed Group approval and immediate termination for "FMLA paperwork" establishes interference with FMLA rights.

## COUNT V: FMLA RETALIATION

64. Plaintiff incorporates all preceding paragraphs by reference.

65. Defendant retaliated against Plaintiff for taking FMLA leave through systematic isolation upon return from her first leave and termination immediately after Reed Group resolved documentation issues in Plaintiff's favor for her second leave.

## COUNT VI: COBRA/ERISA VIOLATIONS

66. Plaintiff incorporates all preceding paragraphs by reference.

67. Defendant failed to provide required COBRA notices within 44 days of termination as required under 29 U.S.C. § 1166(a).

68. From January 29, 2023 through filing, statutory penalties under 29 U.S.C. § 1132(c) exceed $104,000 at $110 per day and continue to accrue daily.

## COUNT VII: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

69. Plaintiff incorporates all preceding paragraphs by reference.

70. North Carolina recognizes wrongful discharge claims when termination violates clear mandates of public policy, including the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.2, the North Carolina Retaliatory Employment Discrimination Act (REDA), N.C. Gen. Stat. § 95-241, and federal statutes including the ADA and FMLA.

71. Defendant terminated Plaintiff for exercising her rights under the ADA and FMLA, and for engaging in protected activity, in violation of North Carolina's public policy in favor of protecting disabled employees and those exercising family medical leave rights.

72. Plaintiff's termination directly contravenes clear public policy by punishing her for requesting reasonable accommodations for her disability and taking medically necessary leave under the FMLA that was approved by Reed Group on December 13, 2022.

73. The termination occurred under circumstances that make clear it was pretextual and designed to circumvent Plaintiff's protected rights, including terminating Plaintiff for "FMLA paperwork" issues just three days after Reed Group resolved those same issues in Plaintiff's favor.

74. As a direct and proximate result of Defendant's wrongful discharge in violation of public policy, Plaintiff has suffered lost wages, lost benefits, loss of career advancement opportunity, severe emotional distress requiring crisis intervention, out-of-pocket medical expenses, and exacerbation of her pre-existing lupus condition.

## COUNT VIII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

75. Plaintiff incorporates all preceding paragraphs by reference.

76. Defendant's conduct was extreme and outrageous, exceeding all bounds of decency tolerated by civilized society, including Franklin's "BECAUSE I CAN" statement when harassing Plaintiff about bereavement leave, corporate breach of explicit promise to wait for Plaintiff's medical appointment, systematic targeting of Plaintiff's disability status through discriminatory comments, and continuation of harassment despite corporate knowledge of Franklin's toxic conduct.

77. Defendant intended to cause severe emotional distress or acted with reckless disregard for the probability that severe emotional distress would result, as evidenced by Franklin's escalating pattern of targeting Plaintiff's disability status and the corporate decision to breach explicit promises regarding medical accommodation while knowing of Plaintiff's fragile mental health state.

78. As a direct and proximate result of Defendant's extreme and outrageous conduct, Plaintiff suffered severe emotional distress evidenced by 8-12 calls to suicide hotlines, requirement for community crisis intervention services, diagnosis of Major Depressive Disorder, ongoing professional counseling, documented panic attacks with physical symptoms witnessed by third parties, and exacerbation of pre-existing lupus condition.

**COUNT IX: RETALIATION UNDER REDA (N.C. Gen. Stat. § 95-241)**

79. Plaintiff incorporates all preceding paragraphs by reference.

80. Plaintiff engaged in protected activity under N.C. Gen. Stat. § 95-241 by asserting rights under the ADA and FMLA, requesting leave, requesting reasonable accommodations, and opposing practices made unlawful under both federal and state law.

81. Defendant unlawfully retaliated against Plaintiff by terminating her on December 16, 2022, within 10 days of her December 6 ADA accommodation request and 3 days after Reed Group reinstated her FMLA eligibility.

82. Defendant's conduct constitutes a violation of REDA.

83. As a result, Plaintiff is entitled to all damages available under REDA, including injunctive relief, back pay, reinstatement or front pay, and attorneys' fees and costs.

84. Plaintiff further asserts that the North Carolina Equal Employment Practices Act (NCEEPA), N.C. Gen. Stat. § 143-422.2, expresses the public policy of the State of North Carolina to protect individuals from discrimination in employment on the basis of disability.

85. Pursuant to N.C. Gen. Stat. § 95-241(a)(1)(b), retaliation for asserting rights under the ADA and FMLA constitutes a violation of REDA.

## VII. DAMAGES

86. As a result of Defendant's unlawful conduct, Plaintiff seeks:

Back Pay: Lost wages from December 16, 2022 through present, accounting for periods of unemployment and underemployment, in an amount to be determined at trial.

Lost Benefits: Health insurance premiums, 401(k) employer match, stock options and other employment benefits, in amounts to be determined at trial.

Out-of-Pocket Medical Expenses: Crisis counseling, ongoing therapy, and related medical costs, in amounts to be determined at trial.

COBRA Penalties: $110 per day from January 29, 2023 through judgment under 29 U.S.C. § 1132(c).

FMLA Liquidated Damages: Equal to actual FMLA-related damages under 29 U.S.C. § 2617(a)(1)(A)(ii) for willful violations.

ADA Punitive Damages: Up to $300,000 for employers with 500+ employees under 42 U.S.C. § 1981a(b)(3) for intentional discrimination.

Emotional Distress Damages: For documented medical evidence including Major Depressive Disorder diagnosis, suicide hotline calls, and crisis intervention, in amounts to be determined at trial.

Front Pay or Reinstatement, Attorneys' Fees and Costs, and Prejudgment Interest.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court:

A. Enter judgment in Plaintiff's favor on all counts;

B. Award compensatory damages including back pay, front pay, lost benefits, and emotional distress damages;

C. Award COBRA statutory penalties continuing through judgment;

D. Award liquidated damages under the FMLA for willful violations;

E. Award punitive damages under the ADA for intentional discriminatory conduct;

F. Grant equitable relief including reinstatement or front pay;

G. Award reasonable attorneys' fees and costs under applicable statutes;

H. Award prejudgment interest on all monetary awards;

I. Grant such other relief as this Court deems just and proper.

## IX. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable under the Seventh Amendment to the United States Constitution.

Respectfully submitted,

/s/ Melanie Stroud
MELANIE STROUD
Plaintiff, Pro Se
8508 Westhope Street
Charlotte, NC 28216
Telephone: (704) 942-8623
Email: melanie.stroud@yahoo.com

## EXHIBITS TO BE FILED

Exhibit A: Reed Group Portal Documentation showing available leave options

Exhibit B: December 12, 2022 Email Chain (Fleming to Stroud re: medical appointment)

Exhibit C: December 16, 2022 Termination Letter (Wright to Stroud)

Exhibit D: January 10, 2023 Unemployment Agency Response containing false statements

Exhibit E: August 10, 2021 Performance Recognition Email Chain

Exhibit F: Medical Certification and Fax Transmission Records

Exhibit G: EEOC Charge No. 430-2023-02738 and Right to Sue Letter

Exhibit H: Affidavit of Angela Webster (Third-Party Witness)

Exhibit I: Medical Records from Payton R. McMahan, PA-C

Exhibit J: USPS Informed Delivery Records demonstrating absence of COBRA notice

Exhibit K: Reed Group Communications and Timeline Documentation

Exhibit L: Documentation of Suicide Hotline Calls and Counseling Records

Exhibit M: Major Depressive Disorder Diagnosis

Exhibit N: June 22-23, 2022 Work Travel Documentation

Exhibit O: October 6 and 21, 2022 HR Complaint Documentation

Exhibit P: October 21, 2022 Email from Quanda Ellington to HR

Exhibit Q: December 27, 2022 Reed Group Denial Email

Exhibit Q-1: December 14, 2022 Reed Group Clarification Request Letter (Claim Number: 903044692173)

Exhibit R: Audio recording of December 16, 2022 termination call

Exhibit S: December 16, 2022 Termination Letter without HR signature

Exhibit T: November 14-16, 2022 Email Chain (O'Connell/Stroud re: Bereavement Documentation)

Exhibit U: Reed Group call notes/records from November 9, 2022

Exhibit V: Witness affidavit regarding December 6, 2022 Teams call with Molly Dubble