# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CIVIL ACTION NO. 3:25-CV-00733-KDB-WCM

| | |
|---|---|
| MELANIE STROUD,<br><br>**Plaintiff,**<br><br>v.<br><br>COCA-COLA CONSOLIDATED, INC.,<br><br>**Defendant.** | <u>**MEMORANDUM AND ORDER**</u> |

**THIS MATTER** is before the Court on Defendant Coca-Cola Consolidated, Inc.'s Motion for Summary Judgment (Doc. No. 50) in this post-termination employment dispute. The Court has carefully considered this motion, and the parties' briefs and exhibits. For the reasons discussed below, the Court will in part **GRANT** and in part **DENY** the motion.

## I. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co., et al.*, 946 F.3d 201, 206 (4th Cir. 2019). A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *8.929 Acres of Land*, 36 F.4th at 252. "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

1

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022). If the movant satisfies his initial burden to demonstrate "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmovant to "present specific facts showing that there is a genuine issue for trial." *8.929 Acres of Land*, 36 F.4th at 252 (quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015)).

"The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021) (quoting *Anderson*, 477 U.S. at 247–48) (emphasis in original). Rather, the nonmoving party must establish that a material fact is genuinely disputed by, inter alia, "citing to particular parts of the materials of record" and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Fed. R. Civ. P. 56(c)(1)(A); *8.929 Acres of Land*, 36 F.4th at 252 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)). And "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *see also Tankesley v. Vidal*, No. 1:21-CV-

2

I448, 2023 WL 4273763, at *2 (E.D. Va. June 29, 2023) ("It is ... well-settled within the Fourth Circuit that 'where a party submits an affidavit that is inconsistent with a witness's deposition testimony, the contradictory affidavit is disregarded for purposes of summary judgment.'").

Still, summary judgment is not intended to be a substitute for a trial of the facts. *Anderson*, 477 U.S. at 249. In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (citation modified). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)). In the end, the relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## II. FACTS AND PROCEDURAL HISTORY

In 2020, pro se Plaintiff Melanie Stroud began working as a contract employee at Defendant Coca-Cola Consolidated, Inc.'s ("Coca-Cola") Charlotte facility. Doc. No. 1 ¶ 13. Later that year, Stroud disclosed to Coca-Cola that she had lupus and "openly discussed" her condition in the workplace. *Id.* ¶¶ 17, 21. Approximately one year later, she was hired as a permanent, remote Collections/Accounts Receivable Representative. *Id.* Stroud alleges that she received "excellent performance feedback" until June 2022, when LaTonya Franklin ("Franklin"), a former colleague, was promoted and became her direct supervisor. *Id.* ¶¶ 14–16.

Stroud contends that after Franklin's promotion, Franklin began "targeting" her because of her disabilities. *Id.* ¶¶ 24–25, 28. The first alleged incident occurred when Stroud notified a different supervisor (and a co-worker) that she would be late that day due to a delayed flight. Doc. No. 50-4 at 5. However, Stroud never worked that day, and later admitted that, after her phone died, "gave up on the day." *Id.* at 5–6. When Stroud logged in the next day, Franklin informed her that she was considered a "no call, no show" for the previous day, because she had not communicated that she would be unable to work at all. *Id.* at 6. Franklin also requested information confirming the flight delay. Doc. No. 1 ¶ 28A. Stroud characterizes this as "retaliation," and alleges that it caused her to have a "severe panic attack." *Id.* ¶¶ 28A, C.

Stroud next alleges that while she was out on FMLA leave for ongoing anxiety symptoms, Franklin viewed her personal Facebook page and remarked to others that "she doesn't look crazy to me." *Id.* ¶ 29. After Stroud returned from FMLA leave in September 2022, Franklin allegedly instructed co-workers to not speak to or assist her and altered her workload so Stroud "wouldn't get a headache or panic." *Id.* ¶¶ 30–31. In November 2022, after Stroud took bereavement leave, Franklin requested documentation of the family member's death. *Id.* ¶ 32. Although such documentation was required under company policy, Stroud contends that other employees had not been asked to provide it. *Id.* ¶ 32. In September 2022, Stroud alleges that she contacted HR to request reassignment to a different supervisor. *Id.* ¶ 34.

Stroud again took FMLA leave for her anxiety from November 17–22, 2022. *Id.* ¶ 39. The leave was conditionally approved pending submission of a medical certification form supporting the need for continuous leave. Doc. No. 50-21 at 2–3. However, Stroud did not submit the required certification. Therefore, on December 5, 2022, Reed Group, Coca-Cola's third-party FMLA administrator, issued a notice denying the leave for "lack of certification." Doc. No. 1 ¶ 40. The

next day, HR informed Stroud that her complaints against Franklin had been partially substantiated, and Franklin would receive management training. *Id.* Despite this, Stroud again requested reassignment. *Id.*

After Coca-Cola learned that Stroud had failed to complete a medical certification for her most recent FMLA leave, HR met with Stroud on December 12, 2022, reiterated that her FMLA leave had been denied, and gave her one additional business day to submit the required certification. Doc. Nos. 50-7; 50-24. That evening, Stroud's medical provider submitted the completed certification to Reed Group indicating that Stroud required reduced hours during the same period she had taken continuous leave. Doc. No. 50-25 at 4.

After receiving notice that the certification did not align with the leave taken, Stroud contacted Reed Group on December 14, 2022. Doc. No. 54-3. During that call, Reed Group, through Stroud's case manager, reversed the denial and granted her ten additional days to submit an amended certification. *Id.* Two days later, however, Coca-Cola terminated Stroud for "unscheduled absences" related to the earlier FMLA denial. Doc. No. 1 ¶ 40. Finally, Stroud alleges that Coca-Cola failed to send her required Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") continuation coverage information. *Id.* ¶ 49. She contends that as a result of these events, her mental health deteriorated, and she was diagnosed with depression. *Id.* ¶ 50.

Stroud filed this action on September 24, 2025, asserting nine claims: disability discrimination, failure to accommodate, and retaliation, all in violation of the American's with Disabilities Act ("ADA"); retaliation and interference in violation of the Family Medical Leave Act ("FMLA"); failure to comply with COBRA regulations; wrongful termination in violation of public policy; intentional infliction of emotional distress; and retaliation under the North Carolina

Retaliatory Employment Discrimination Act ("REDA"). Following discovery, Coca-Cola moved for summary judgment. Stroud has responded, and the motion is now ripe for disposition.

## III. DISCUSSION

As a preliminary matter, Coca-Cola contends that any conduct predating December 3, 2022, that could give rise to Stroud's claims for disability discrimination or retaliation or failure to accommodate is time-barred. Doc. No. 50-33 at 8. The ADA incorporates Title VII's administrative enforcement scheme, including the requirement that a plaintiff exhaust administrative remedies by timely filing an EEOC charge identifying the alleged discriminatory conduct before initiating suit in federal court. *Irvin v. Versatrim, LLC*, 737 F. Supp. 3d 297, 307 (E.D.N.C. 2024).

To distill the point, "an employee cannot seek redress in federal court for an employer's alleged discriminatory conduct unless [s]he filed a[n EEOC charge] within 180 days after the alleged unlawful practice occurred." *Hospodor v. Burlington Indus., Inc.*, 205 F.3d 1333, 2000 WL 203933, at *1 (4th Cir. 2000) (citing *McCullough v. Branch Banking & Trust Co.,* 35 F.3d 127, 131 (4th Cir. 1994) (claim is time-barred in federal court if employee does not file a timely charge with the EEOC)) (additional citations and internal quotations omitted). Relevant here, the EEOC charge must be filed within 180 days of *each alleged discrete act of discrimination* under the ADA. *Irvin,* 737 F. Supp. 3d at 307 (first citing 42 U.S.C. § 2000e-5(e)(1); and then citing 42 U.S.C. § 12117(a)). And, "only incidents that took place within the timely filing period are actionable." *Id.* at 308 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)) (additional citations omitted).

Stroud responds that even if certain events occurred more than 180 days before her EEOC Charge, she "describes a continuous sequence of related events" and the continuing violation

doctrine therefore preserves those earlier acts. Doc. No. 54-1 at 12–13. But under *Morgan*, the continuing violation doctrine applies only to claims involving an ongoing pattern of unlawful conduct—most commonly hostile work environment claims—rather than discrete acts of discrimination or retaliation. 536 U.S. at 122. Indeed, "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.* at 114. *See also Perkins v. Int'l Paper Co.*, 936 F.3d 196, 209 n.5 (4th Cir. 2019) (explaining that the continuing violation doctrine applies to hostile work environment claims, but not disparate treatment or retaliation claims). To invoke the doctrine, a plaintiff must show that the challenged conduct reflects a "fixed and continuing practice," not a series of independently actionable events. *Keith-Foust v. N. Carolina Cent. Univ.*, No. 1:15CV470, 2016 WL 4256952, at *6 (M.D.N.C. Aug. 11, 2016) (quoting *Nat'l Advert. Co. v. City of Raleigh*, 947 F.2d 1158, 1166 (4th Cir. 1991)); *see also McGinn v. Broadmead, Inc,* 167 F.4th 667, 675 (4th Cir. 2026).

Consistent with *Morgan*, the Fourth Circuit has held that outside of a hostile work environment claim, "each instance of discrimination [and retaliation] is a discrete act," and earlier acts are not rendered timely merely because they resemble later ones. *Keith-Foust,* 2016 WL 4256952, at *6 (quoting *Szedlock v. Tenet*, 61 F. App'x 88, 93 (4th Cir. Apr. 3, 2003)); *see also Morgan*, 536 U.S. at 113–14, 122; *Perkins,* 936 F.3d at 209 n.5. Each denial of a reasonable accommodation request under the ADA is likewise a discrete act that triggers its own limitations period, and repeated denials do not constitute a continuing violation. *See Hill v. Hampstead Lester Morton Court Partners LP*, 581 F. App'x 178, 181 (4th Cir. 2014); *see also Szedlock,* 61 F. App'x at 93 (applying *Morgan* to failure to accommodate claim). Thus, absent an ongoing discriminatory policy or a hostile work environment, separate and distinct acts of discrimination, including

7

retaliation and failures to accommodate, are discrete acts for which the continuing violation doctrine is unavailable.

Here, Stroud filed a Charge of Discrimination with the Equal Employment Opportunity Council ("EEOC") on June 1, 2023, alleging disability discrimination and retaliation and failure to accommodate. Doc. No. 50-31 at 2–3. She does not assert a claim for hostile work environment.[1] Accordingly, Stroud was required to file an EEOC charge within 180 days of each discriminatory event. So, any allegedly discriminatory event occurring before December 3, 2022, (180 days before the Charge was filed), is time-barred.

### A.      Disability Discrimination

Stroud first alleges that Coca-Cola discriminated against her because of her medical disabilities. The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to ... the hiring, advancement, or discharge of employees, ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case for disability discrimination under the ADA, Stroud must show: "(1) that she has a disability, (2) that she is a 'qualified individual' for the employment in question, and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability." *Jacobs,* 780 F.3d at 572 (quoting *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000)).

---

[1] Stroud does allege several instances of what she characterizes as harassment or hostile treatment from Franklin, including when Franklin required her to follow company policies related to attendance and taking bereavement leave, and asking coworkers to leave her alone and not talk to her on her first day back from FMLA leave. Doc. Nos. 1 ¶¶ 27, 37; 50-31 at 2–3. Nevertheless, describing conduct as harassing or hostile does not alone transform otherwise discrete employment actions into a hostile work environment claim, which in any event, Stroud has not pled.

8

"An ADA plaintiff bears the burden of proving that she is a 'qualified individual with a disability'—that is, a person 'who, with or without reasonable accommodation, can perform the essential functions' of her job." *Stanley v. City of Sanford, Florida*, 606 U.S. 46, 54, 222 L. Ed. 2d 331 (2025) (quoting *Cleveland,* 526 U.S. at 806). *See also Williams v. Brunswick Cnty. Bd. of Educ.*, 725 F. Supp. 2d 538, 544 (E.D.N.C. 2010), *aff'd,* 440 F. App'x 169 (4th Cir. 2011). A medical impairment alone does not place an individual within the ADA's protected class. *Williams*, 725 F. Supp. 2d at 544 (citing *Hooven-Lewis v. Caldera*, 249 F.3d 259, 269–71 (4th Cir. 2001)) (additional citation omitted). Rather, the impairment must "substantial[ly] limit[ …] one or more major life activities." 42 U.S.C. § 12102(1)(A)); *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 174 (4th Cir. 2024). Work is a major life activity. 42 U.S.C. § 12102(2)(A).

A plaintiff must also demonstrate that her employer took adverse action against her. "An adverse employment action is a discriminatory act that adversely affects the terms, conditions, or benefits of the plaintiff's employment." *Terry v. Perdue*, No. 20-2016, 2021 WL 3418124, at *1 (4th Cir. Aug. 5, 2021) (quoting *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007)) (cleaned up). Such actions include a "decrease in compensation, job title, level of responsibility, or opportunity for promotion." *Id.* (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004)). *See also Williams*, 725 F. Supp. 2d at 547 (In ADA discrimination matters, "the Fourth Circuit continues to require that a plaintiff show an ultimate employment action that affects hiring, granting leave, discharging, promoting, and compensating.") (citation and internal quotations omitted). In essence, the plaintiff's "disability must be a but-for cause" of the adverse action. *Campbell v. StoneMor Partners, LP*, No. 3:17-CV-407, 2018 WL 3451390, at *4 (E.D. Va. July 17, 2018), *aff'd,* 752 F. App'x 166 (4th Cir. 2019) (citing *Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 236 (4th Cir. 2016)).

A plaintiff may prove discrimination through "direct or indirect evidence," or through the *McDonnell Douglas* burden-shifting framework. *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 303 (4th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). Because Stroud relies primarily on circumstantial evidence, the burden-shifting framework applies. Thus, if she establishes a prima facie case, Coca-Cola will bear the burden of "articulat[ing] a legitimate, nondiscriminatory reason for the termination." *EEOC v. Loflin Fabrication, LLC*, 482 F. Supp. 3d 586, 599 (M.D.N.C. 2020) (citing *Leonard v. Electro-Mechanical Corp.*, 36 F. Supp. 3d 679, 688 (W.D. Va. 2014)). If Coca-Cola does so, Stroud must then show that the proffered reason is a "pretext for discrimination." *Id.*

Here, the only event within the limitations period that Stroud identifies as discriminatory is her termination on December 16, 2022. Doc. No. 1 ¶¶ 51–54. Stroud asserts she is "disabled" under the ADA, and that her "disability" was the but-for cause of her termination. *Id.* ¶¶ 17, 21, 53–54. Coca-Cola responds that Stroud does not have a disability under the ADA because she provided no medical or other evidence showing a substantial limitation in a major life activity.[2] Doc. No. 50-33 at 11–12.

It is undisputed that Stroud has been diagnosed with lupus and generalized anxiety disorder with panic attacks. Doc. No. 50-20. Stroud contends that her lupus produces a range of symptoms,

---

[2] A major life activity is "substantially limited" when an individual cannot perform that activity as most people in the general population could perform it, or if she faces significant restrictions in the condition, manner, or duration under which she can perform the activity. 29 C.F.R. § 1630.2(j)(1)(i)–(ii,), (4)(i)–(ii). *See also Miller v. Maryland Dep't of Nat. Res.*, 813 F. App'x 869, 875 (4th Cir. 2020). "'Substantially limits' is not meant to be a demanding standard." § 1630.2(j)(1)(i). And, "the definition of disability ... shall be construed in favor of broad coverage of individuals ... to the maximum extent permitted ...." *Rodriguez v. Wells Fargo Bank, N.A.*, No. 3:21-CV-248-MOC, 2023 WL 5493593, at *3 (W.D.N.C. Aug. 24, 2023) (quoting 42 U.S.C. § 12102(2)(A)).

including changes to her voice, migraines, nosebleeds, swelling in her neck and face, painful red patches, and impaired vision. Doc. No. 50-1 23–24. When these symptoms flared during work, Stroud would tell her boss that she was having a "lupus day" and coordinate a schedule adjustment. *Id.* at 25–26. That practice continued after Stroud was transferred to Franklin's supervision, and she acknowledges that Franklin never denied such a request. *Id.* at 27; 38–40. Stroud further concedes that she was never disciplined for taking time off on account of her lupus symptoms. *Id.* 40–41. And the only act she identifies as discriminatory—her termination—was entirely unrelated to lupus. Indeed, the FMLA leave for which Stroud claims she was terminated was taken for her generalized anxiety disorder and panic attacks, not for lupus. Doc. No. 50-25 at 6. Thus, even assuming Stroud's lupus renders her disabled (a question the Court need not resolve) she has adduced no evidence that lupus was the but-for cause of her termination.

Stroud's generalized anxiety disorder with panic attacks fares no better. Stroud identifies a single job function affected by the condition—her ability to interact with Franklin—and the accommodation she sought was reassignment to a different supervisor. Doc Nos. 1 ¶ 39; 50-1 at 28. And, Stroud acknowledges that she could "perform the essential functions of her position with [this] reasonable accommodation and/or protected medical leave." Doc No. 50-32 at 4. Her symptoms, by her own account, arose from the manner in which Franklin spoke to and treated her. *See* Doc. No. 50-1 at 28. As Stroud herself put it, "I thought it was best to be on another team [with a different supervisor] so that I can … still do my job … and have the same clients and customers and hours …. [N]othing else would change." *Id.* at 37. Put simply, Stroud does not allege that she is unable to perform her work generally, only that she cannot work with Franklin.

Because Stroud has failed to allege facts showing that she was broadly foreclosed from jobs utilizing her individual skills as a result of her anxiety disorders, Stroud has failed to establish

that she is disabled within the meaning of the ADA. *See Knight v. McCarthy*, 439 F. Supp. 3d 744, 759 (E.D. Va. 2020) (rejecting claim that plaintiff's "panic anxiety disorder" affected her ability to work with her supervisor and rendered her disabled, explaining "it is well-established that the inability to work with particular co-workers or supervisors does not create a substantial limitation on the major life activity of working."); *Rodriguez v. Wells Fargo Bank, N.A.*, No. 3:21-CV-248-MOC, 2023 WL 5493593, at *4 (W.D.N.C. Aug. 24, 2023) (rejecting remotely employed plaintiff's claim that she was disabled where she alleged only that her generalized anxiety disorder "limited her ability to work with" a specific colleague); *Howell v. Holland*, Civil Action No. 4:13-cv-00295-RBH, 2015 U.S. Dist. LEXIS 21124, at *11–16 (D.S.C. Feb. 23, 2015) (ADA plaintiff not disabled where there was no evidence that his impairments prevented him from working in his profession, noting it "strained credulity to conclude that [the plaintiff was] substantially limited in the major life activity of working simply because he [could not work with a specific co-worker]"). Coca-Cola is therefore entitled to summary judgment on Stroud's ADA discrimination claim.

### B. Failure to Accommodate

Stroud next alleges that Coca-Cola failed to accommodate her or participate in the required "interactive process" when she requested a "flexible schedule, modified breaks, and workplace modifications." Doc. No. 1 ¶¶ 56–57. More specifically, Stroud alleges that when she spoke with Molly Dubble in Human Resources on December 6, 2022, she requested to be moved to a different supervisor as an accommodation.[3] Doc. Nos. 1 ¶ 58; 50-1 at 35–36; 50-5 at 4; 50-31 at 3.

To establish a prima facie case for failure to accommodate, Stroud must show: "(1) [she has] a disability within the meaning of the ADA; (2) the employer had notice of the disability; (3)

---

[3] All other alleged requests for accommodation occurred prior to December 3, 2022, and are therefore time-barred.

with reasonable accommodation, [she] could perform the essential functions of the position; and (4) the employer refused to make such accommodations." *Equal Employment Opportunity Comm'n v. Manufacturers & Traders Tr. Co.*, 429 F. Supp. 3d 89, 103 (D. Md. 2019) (citing *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)) (additional citations omitted). However, if the employee cannot show the accommodation is reasonable, summary judgment against the plaintiff typically follows. *Id.*

Notwithstanding that Stroud's alleged requests for reasonable accommodation for her lupus occurred prior to December 3rd, it is undisputed that Coca-Cola reasonably accommodated those requests, including adjusting her breaks and working hours as requested, as if it were a disability. Additionally, for the reasons explained above, Stroud has not demonstrated that she is disabled under the ADA because of her anxiety and panic disorder. But even assuming she had, Stroud has not shown that her request to be transferred to a new supervisor was reasonable.

The general consensus in this circuit is that requesting a different supervisor as a reasonable accommodation is "unreasonable as a matter of law." *Abdelkhalek v. Worksource Montgomery*, No. 8:25-CV-01438-PX, 2026 WL 369252, at *4 (D. Md. Feb. 10, 2026). *See Adinolfi v. N. Carolina Dep't of Just.*, No. 5:18-CV-539-FL, 2022 WL 956330, at *17 (E.D.N.C. Feb. 25, 2022), *aff'd*, No. 22-1329, 2023 WL 1814206 (4th Cir. Feb. 8, 2023) ("Here, where plaintiff's request [was triggered] by the presence of [his supervisors] ..., reassignment on that basis was not reasonable. The law does not require employers to construct preferential accommodations that maximize workplace opportunities for their disabled employees." (quoting *Elledge v. Lowe's Home Centers, LLC*, 979 F.3d 1004, 1015 (4th Cir. 2020)); *Smith v. Charter Commc'ns, Inc.*, No. 3:18-CV-80-MOC-DSC, 2020 WL 3606391, at *8 (W.D.N.C. July 2, 2020) ("Plaintiff's ADA

accommodation claim fails because changing an employee's supervisor as an accommodation is unreasonable as a matter of law.").

"Where, as here, the stated reason for the request is to reduce the employee's anxiety, the requested accommodation [is] untenable because it imposes 'a wholly impractical obligation' on the employer to retool a supervisory plan based solely on the fluctuating stress levels of the supervisee." *Abdelkhalek*, 2026 WL 369252, at *4. *See also Smith v. Wormuth*, No. 1:20-CV-00419-JRR, 2024 WL 1012887, at *12 (D. Md. Mar. 8, 2024), *aff'd sub nom. Smith v. Driscoll*, No. 24-1577, 2025 WL 2622572 (4th Cir. Sept. 11, 2025) (concluding that "Plaintiff's accommodation requests for reassignment to a different supervisor [because the supervisor] exacerbated her anxiety and panic disorder] were *per se* unreasonable, because a defendant is not required to provide an employee with a different supervisor as an accommodation." (internal quotations and citation omitted)).

Because Stroud identifies no other timely, administratively exhausted accommodation request capable of supporting her claim, Coca-Cola is therefore entitled to summary judgment on this claim.

### C. ADA Retaliation

Stroud also alleges that she engaged in protected activity on December 6, 2022, when she requested reassignment to a different supervisor as a reasonable accommodation for her anxiety and panic disorders. Doc. No. 1 ¶ 59. She alleges that Coca-Cola retaliated against her by terminating her employment ten days later. *Id.* ¶ 60.

To establish a prima facie case for retaliation under the ADA, Stroud must show: "(1) [s]he engaged in protected conduct,[4] (2) [s]he suffered [a materially] adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012). A "materially adverse" action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Crawford v. Prince George's Cnty. Bd. of Educ.,* No. CV JKB-20-00048, 2023 WL 2600363 (D. Md. Mar. 21, 2023), *aff'd,* No. 23-1430, 2023 WL 6421010 (4th Cir. Oct. 2, 2023) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70 (2006)). And to ultimately prevail, she must either present "sufficient direct and indirect evidence of retaliation, or proceed under [the aforementioned *McDonnell Douglas*] burden-shifting method." *Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 173–74 (4th Cir. 2023) (quoting *Smith v. CSRA*, 12 F.4th 396, 416 (4th Cir. 2021)) (additional citation omitted).

Even assuming that Stroud engaged in protected activity when she requested reassignment to a different supervisor—and further assuming that the temporal proximity between that request and her termination could, standing alone, satisfy the causal-link requirement—Coca-Cola has nonetheless articulated a legitimate, non-retaliatory basis for the termination: Stroud's use of "unauthorized" leave. Although Stroud characterizes this explanation as pretextual, she proffers no facts from which a reasonable factfinder could infer that Coca-Cola's stated rationale was a pretext for ADA retaliation based on her request for a new supervisor. Because Stroud has failed to produce evidence permitting a reasonable inference of retaliatory animus, Coca-Cola is entitled to summary judgment on this claim.

---

[4] Making a reasonable accommodation request is protected activity under the ADA. *Jacobs,* 780 F.3d at 577.

### D.    FMLA Retaliation

In Stroud's first FMLA-related claim, she asserts that Coca-Cola retaliated against her for taking protected FMLA leave.[5] To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in "protected activity"; (2) "her employer took an adverse employment action against her"; and (3) a causal connection exists between the protected activity and the adverse action. *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc).

The relevant facts are largely undisputed. On November 11, 2022, Stroud visited her medical provider to report "worsening symptoms of anxiety, panic attacks, [and] work-related stress," and that same day requested FMLA leave from Reed Group. Doc. No. 50-20 at 4. Reed Group acknowledged her request for continuous leave from November 15–22, 2022, and conditionally approved it pending her provider's completion of a medical certification form, which it provided to Stroud. Doc. No. 50-21 at 2–3. Stroud was given twenty days to return the form (which is more generous than the applicable regulation). *Id.* at 3. And, Stroud took the full period of continuous leave that she requested, but did not return the certification. On November 28, 2022, Reed Group sent her a reminder and a second blank certification form. Doc. No. 50-22.

When Stroud still did not respond and the twenty days had lapsed, Reed Group denied her leave in a letter dated December 5, 2022. Doc. No. 50-23. Rather than terminate her for lack of certification, however, Coca-Cola's human resources personnel met with Stroud on December 12, 2022, and extended her deadline to the close of business the following day. Doc. Nos. 50-7; 50-

---

[5] Because Stroud's July–September FMLA requests were approved and utilized and do not appear to be in dispute in either of her FMLA claims, the Court will address only the November FMLA request.

24. Stroud asserted at that meeting that Reed Group had already granted her an extension.[6] Doc. No. 50-24 at 2–3. That evening, and consistent with her medical records, Stroud's provider submitted a certification for reduced leave, expressly answering "no" to whether continuous leave was needed. Doc. No. 50-25 at 4. *See also* Doc. No. 50-20 at 4 (November 11, 2022, visit with medical provider who eventually signed the medical certification. The provider documented, "She will work on a part-time schedule for the next 2-1/2 weeks. Patient will clock in and work from 8-11 am and again from 2 PM to 5 PM. This reduces her contact with her supervisor by at least 2-3 hours a day to alleviate some of her stress. Any further accommodations or time away from work will need to be managed by psychiatry.").

On December 13, 2022, Reed Group emailed Stroud to let her know that clarification was needed because the certification authorized reduced rather than continuous leave. Doc. No. 54-5 at 3. On December 14, 2022, Stroud contacted Reed Group and the Claims Case Manager "[o]verturned [the] denial" allowing her until December 28, 2022, to gather additional paperwork.[7] Doc. No. 50-28. Two days later, on December 16, 2022, Coca-Cola terminated Stroud for taking unauthorized leave from November 15–22, 2022. Doc. No. 50-27. Finally, on December 27, 2022,

---

[6] Stroud provides no evidence of this communication—such as the Reed Group communication log she provided for the December 14, 2022, call—beyond her own statements that such a call took place. Moreover, her own records show no evidence that she made an extension request to Reed Group between November 11, 2022, the date of the FMLA request and December 14, 2022. *See* Doc. No. 54-5.

[7] Coca-Cola asserts that it was unaware of this request until litigation began. *See* Doc. No. 50-7 at 3 ("During the course of this litigation, CCCI became aware that, on or about December 14, 2022, Ms. Stroud made another request to the Reed Group to approve her FMLA leave covering her November 15, 2022 through November 22, 2022 absences. When making this request to the Reed Group, Ms. Stroud cited a dispute between herself and her healthcare provider regarding the medical certification needed to support this continuous leave. CCCI was not aware of this additional FMLA request at the time CCCI decided to discharge her.").

Reed Group, still not having received an updated medical certification form, formally denied the leave. Doc. No. 50-29.

It is undisputed here that Stroud engaged in protected activity by taking FMLA leave and that she suffered an adverse employment action when she was terminated. Thus, the prima facie inquiry turns on causation. Unlike interference claims, employer intent is relevant in an FMLA retaliation claim. *Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179, 191 (4th Cir. 2017). When direct evidence of retaliatory intent is lacking, a plaintiff may rely on circumstantial evidence, which courts evaluate under the *McDonnell Douglas* burden-shifting framework.[8] *Id.* (citing *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 304 (4th Cir. 2016)).

Under *McDonnell Douglas,* once a plaintiff establishes a prima facie case, "a presumption of retaliation arises and the 'burden of production then shifts to the employer to rebut the ... presumption of retaliation and provide [a] legitimate, nondiscriminatory reason for the adverse employment action.'" *Id.* (quoting *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016)). If the employer does so, the burden returns to the plaintiff to show that the "proffered explanation is merely a pretext for [retaliation]," either because it is not credible or because retaliation is the more likely explanation. *Id.* at 191–192 (quoting *Sharif,* 841 F.3d at 203). Thus, to survive summary judgment on an FMLA retaliation claim, Stroud must "produce sufficient evidence to create a genuine dispute of material fact such that a reasonable factfinder could conclude the adverse employment action was taken for an impermissible reason, i.e., retaliation." *Id.* (quoting *Sharif,* 841 F.3d at 203).

---

[8] FMLA retaliation claims are evaluated under the same burden-shifting framework that governs Title VII discrimination and retaliation claims. *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013); *Yashenko v. Harrah's N.C. Casino Co.*, 446 F.3d 541, 546 (4th Cir. 2006).

Stroud argues that she has established a prima facie case of retaliation by demonstrating both close temporal proximity (termination less than a month after returning from medical leave) and providing evidence that Coca-Cola terminated her for taking "unauthorized" FMLA leave during a period in which it had granted her additional time to update her medical certification.[9] Coca-Cola responds that the completed medical certification was insufficient and she was terminated not for taking FMLA, but for taking leave that became unauthorized once she provided a medical certification for a different type of leave.

Because the FMLA permits both continuous and intermittent leave, Coca-Cola—through Reed Group—requires its employees to specify the type of FMLA leave they are requesting. *See, e.g.,* Doc. No. 50-25 at 4. As explained, Stroud requested and took continuous leave, yet her provider certified only reduced leave. Coca-Cola correctly observes that "[a]n employee requesting FMLA leave must 'provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request.'"[10] *Shoemaker v. Alcon Lab'ys, Inc.*, 741 F. App'x 929, 932 (4th Cir. 2018) (quoting 29 C.F.R. § 825.303(b)). A certification is insufficient where, though complete, "the information provided is vague, ambiguous, or non-

---

[9] For "purposes of establishing a prima facie case, close temporal proximity between activity protected by the statute and an adverse employment action may suffice to demonstrate causation." *Waag v. Sotera Def. Sols., Inc.,* 857 F.3d at 192 (citing *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004), *abrogation on other grounds recognized by Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243, 299 (4th Cir. 2015)).

[10] After an employer requests a medical certification prior to approving FMLA leave, the employee has 15 days to provide it, unless the employer provides a greater number of days. 29 U.S.C. § 2613(a); 29 C.F.R. § 825.305(b). If the certification is returned incomplete or is insufficient, the employer must provide the employee with 7 days to cure the deficiency. § 825.305(c). A certification is sufficient if it includes: "the date on which the serious health condition commenced"; its "probable duration"; the "appropriate medical facts" within the health care provider's knowledge, regarding the condition; and for reduced leave, a statement of the medical necessity for the intermittent leave or leave on a reduced leave schedule and "the expected duration of the intermittent leave or reduced leave schedule." 29 U.S.C. § 2613(b)(1)–(3), (6).

19

responsive." § 825.305(b). In that circumstance, the employer must provide the employee with seven calendar days to cure the deficiency. *Id.*

Although the completed certification did not comport with the leave taken, it was not "vague, ambiguous, or non-responsive" on its face, so Coca-Cola was not required to give Stroud additional time to amend the certification. Even so, it is undisputed that (1) once the discrepancy between the leave taken and the leave certified came to light, Stroud contacted Reed Group, which overturned the denial and gave her until December 28, 2022, to correct the deficiency, and (2) that Coca-Cola terminated her two days later. Accordingly, Stroud has made a prima facie showing of FMLA retaliation. But for the termination, Stroud may have been able to furnish a compliant certification within the time Reed Group allowed. Coca-Cola's professed ignorance of that extension until litigation began neither rebuts this showing nor supplies a legitimate, nondiscriminatory reason for the termination. That the proverbial left hand did not know what the right hand was doing makes no difference.

Under settled principles of agency, a principal may be bound by the acts of its agent taken with actual or apparent authority. *Convergent Acquisitions & Dev., Inc. v. Credent Real Estate, Inc.,* No. 3:06CV324, 2007 WL 2137829, at *3 (W.D.N.C. July 23, 2007) (citing *McGarity v. Craighill, Rendleman, Ingle & Blythe, P.A.,* 83 N.C. App. 106, 109 (1986)) (additional citation omitted). In North Carolina, two factors are essential to an agency relationship: "(1) [t]he agent must be authorized to act for the principal; and (2) [t]he principal must exercise control over the agent." *Id.* (quoting *Crist v. Crist,* 145 N.C. App. 418, 425 (2001)).

An agent with actual authority may "affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to [it]." *Wille v. Lutnick*, 158 F.4th 539, 546 (4th Cir. 2025) (quoting Restatement (Second) of Agency § 1(7) (1958)). An agent with

apparent authority, in turn, may affect the principal's "legal relations with third parties" where the third party reasonably believes, based on the principal's manifestations, that the agent is authorized to act for the principal. *Id.* at 546–47 (citing Restatement (Second) of Agency § 1(8) (1958)). And, "absent fraud or collusion, any knowledge acquired by an agent while acting within the scope of his authority is imputed to the principal." *Rutherford v. John Hancock Mut. Life Ins. Co.*, 562 F.2d 290, 293 (4th Cir. 1977) (citing *Thomas-Yelverton Co. v. State Cap. Life Ins. Co.*, 238 N.C. 278, 77 S.E.2d 692 (1953)).

Coca-Cola alleges neither fraud nor collusion, and it concedes that Reed Group was, during the relevant time, authorized to make all FMLA determinations on its behalf. *See* Doc. No. 50-33 at 2 ("The Reed Group was a third-party administrator for CCCI for FMLA and ADA."). *See also* Doc. No 50-7 ¶ 3 ("During the July through December 2022 time frame, the Reed Group was a third-party administrator who assisted CCCI in managing FMLA and ADA claims by processing such claims and by keeping CCCI updated on the status of such claims."). Coca-Cola further acknowledges that its supervisors did not process or decide FMLA claims. *Id.* ¶ 4.

However, the record reflects that Stroud was granted additional time to submit an amended certification and that the FMLA denial was overturned during that time. Because the certification process had not yet concluded, whether her leave was ultimately unauthorized remained unresolved. Yet Coca-Cola terminated her for taking "unauthorized leave" during that interim period. A reasonable jury could view the termination as retaliatory. Accordingly, the Court will deny summary judgment on this claim.

### E. FMLA Interference

In Stroud's second FMLA-related claim, she alleges, on the same facts asserted in her FMLA retaliation claim, that Coca-Cola interfered with her FMLA rights by terminating her over paperwork issues concerning her November medical certification.

The FMLA "grants valuable leave and restoration rights to eligible employees," *Hannah P. v. Haines*, 80 F.4th 236, 244 (4th Cir. 2023) (quoting *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005)), and safeguards those rights by making it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the statute. 29 U.S.C. § 2615(a)(1). A violation of § 2615(a)(1) gives rise to what courts commonly refer to as an FMLA interference claim. *Hannah P.,* 80 F.4th at 244 (citing *Yashenko,* 446 F.3d at 546). Such a claim permits a court to "inquire into matters such as whether the employee would have exercised his or her FMLA rights in the absence of the employer's actions." *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 427 (4th Cir. 2015) (quoting *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 91 (2002)), *abrogated on other grounds by Hansley v. DeJoy,* No. 23-1426, 2024 WL 4947275 (4th Cir. Dec. 3, 2024).

To prevail on an interference theory, an employee must first show that the employer interfered with, restrained, or denied the exercise of an FMLA right to which she was entitled. *Hannah P.,* 80 F.4th at 244 (quoting § 2615(a)(1)); *see also Ragsdale*, 535 U.S. at 81. However, an employer cannot "interfere" with an employee's FMLA leave if the employee has taken the leave they were entitled to take. *Bigelow v. Syneos Health, LLC*, No. 5:20-CV-28-D, 2020 WL 5078770, at *3 (E.D.N.C. Aug. 27, 2020) (collecting cases). In other words, an FMLA interference claim arises when a defendant interferes with the "*provision* of [the FMLA] benefit." *Id.* (emphasis added).

Here, however, Stroud does not allege that Coca-Cola interfered with her ability to take FMLA. And, a later termination for failing to provide a proper medical certification does not amount to interference. Rather, the proper claim to remedy Stroud's "alleged harm is not an FMLA interference claim, but an FMLA retaliation claim," which she has separately asserted. *Bigelow,* 2020 WL 5078770, at *3. Accordingly, summary judgment in favor of Coca-Cola is appropriate here.

### F. COBRA violation

Next, Stroud alleges that Coca-Cola violated COBRA when she failed to receive notification of her COBRA rights in the mail after her termination.

Under COBRA, "an employer has a duty to notify an employee of her right to continue health insurance coverage." *Harvey v. Mingo Logal Coal Co.*, 274 F. Supp. 2d 791, 794 (S.D.W. Va. 2003), *aff'd sub nom. Harvey v. Mingo Logan Coal Co.*, 104 F. App'x 838 (4th Cir. 2004). A "qualifying event" includes termination of employment for any reason other than gross misconduct. 29 U.S.C. §§ 1161(a); 1163(2). Both the employer and the plan administrator share responsibility for ensuring that eligible employees receive timely notice of their COBRA rights. 29 U.S.C. § 1166(a).

Courts generally hold that a "good faith attempt to comply with a reasonable interpretation of the provision is sufficient." *Roberts v. Nat'l Health Corp.*, 963 F. Supp. 512, 514 (D.S.C. 1997), *aff'd,* 133 F.3d 916 (4th Cir. 1998) (collecting cases). A good faith attempt includes "sending notice via first-class mail to the beneficiary's last known address." *Id.* (citations omitted); *see also Covert v. Lane Constr. Corp.*, No. 1:11CV1156, 2013 WL 12136499, at *1 (M.D.N.C. Apr. 19, 2013). Courts likewise find that affidavits and business records demonstrating that a COBRA notice was generated and mailed in accordance with an employer's "customary" business practices

23

constitutes sufficient evidence of compliance, even where plaintiffs allege that they did not receive the notice, absent evidence that the mailing deviated from established procedures. *Id.* (citing *Myers v. King's Daughters Clinic,* 912 F. Supp. 233, 236 (W.D. Tex.), *aff'd,* 96 F.3d 1445 (5th Cir. 1996)).

Here Coca-Cola has produced copies of both a COBRA Enrollment Notice and COBRA Information Notice, both dated December 21, 2022, and addressed to Stroud at the address reflected in its records. *See* Doc. No. 50-30 at 2–6, 8–17. Coca-Cola also provides business records showing that the COBRA Information Notice was generated on December 20, 2022, assigned an estimated delivery date of December 27, 2022, and was marked as "delivered." *Id.* at 17–18.

Stroud contends that Coca-Cola must first "show a reliable, established mailing process"— and that such a process was followed for her specific notice—before any presumption of mailing arises. Doc. No. 54-1 at 33. She cites no authority, however, imposing such a heightened requirement. She further argues that the business record's notation of "delivered" could refer merely to completion of the third-party vendor's printing or assembly process. *Id.* But she again offers no evidence suggesting that Coca-Cola's customary mailing procedures were not followed or that the notices were not, in fact, mailed to her last known address.

The Court therefore concludes that Coca-Cola made a good-faith attempt to comply with COBRA's notice requirements by generating and mailing the required notices to Stroud at her address of record, which is supported by contemporaneous business records reflecting its standard mailing procedures. Stroud offers no evidence creating a genuine dispute of material fact on this issue. Accordingly, Coca-Cola is entitled to summary judgment on this claim.

24

### G. Wrongful Termination in Violation of Public Policy

Stroud also alleges that Coca-Cola wrongfully terminated her for "exercising her rights under the ADA and FMLA." Doc. No. 1 ¶¶ 71–72. She contends that such conduct violates North Carolina's public policy "in favor of protecting disabled employees and those exercising family medical leave rights." *Id.* ¶ 71.

In North Carolina, a claim for wrongful discharge in violation of public policy is a narrow exception to the general rule that an at-will employee can be fired for any reason or no reason. *Horne v. Cumberland Cnty. Hosp. Sys., Inc.,* 746 S.E.2d 13, 17 (N.C. Ct. App. 2013) (citing *Garner v. Rentenbach Constructors Inc.,* 350 N.C. 567, 571 (1999)). The exception is "confined to the express statements within [the North Carolina] General Statutes or … Constitution." *Whiting v. Wolfson Casing Corp.,* 173 N.C. App. 218, 222 (2005) (citation omitted). Accordingly, "wrongful discharge claims must be pled with specificity." *Hopkins v. MWR Mgmt. Co.*, No. 15 CVS 697, 2015 WL 6829326, at *5 (N.C. Super. Nov. 5, 2015) (citing *Gillis v. Montgomery Cnty. Sheriff's Dep't,* 191 N.C. App. 377, 379 (2008)). In other words, a plaintiff is required to "allege specific conduct that violated a specific expression of North Carolina public policy." *Id.* (citing *Considine v. Compass Grp. USA, Inc.*, 145 N.C. App. 314, 321–22 (2001), *aff'd,* 354 N.C. 568 (2001)); *Salter v. E & J Healthcare, Inc.,* 155 N.C. App. 685, 693 (2003).

NCEEPA declares it to be the public policy of North Carolina to "safeguard the right and opportunity to seek and hold employment without discrimination or abridgement on account of 'race, religion, color, national origin, age, sex or handicap.'" *Edwards v. Strata Solar, LLC*, 925 S.E.2d 302, 306 (N.C. Ct. App. 2025), *review denied,* 930 S.E.2d 257 (N.C. 2026), and *writ denied,* 930 S.E.2d 261 (N.C. 2026) (quoting N.C.G.S. § 143-422.2). Here, Stroud alleges that her ADA and FMLA claims are sufficient to create a genuine dispute of material fact as to her claim of

wrongful termination in violation of public policy. They are not. She cites no authority holding that ADA-based activity can serve as the predicate for a wrongful termination claim grounded in NCEEPA, and in any event, the Court's earlier analysis forecloses her ADA theories.[11]

Nor can Stroud rely on the FMLA. The Court is not aware of any North Carolina appellate decision recognizing a wrongful discharge claim based on alleged FMLA violations. Further, "[f]ederal courts applying North Carolina law have refused to hold that a termination that violates the FMLA also violates North Carolina public policy." *Herndon v. TIAA-CREF Individual & Institutional Servs., LLC*, 654 F. Supp. 2d 400, 405 (W.D.N.C. 2009) (first citing *Baucom v. Cabarrus Eye Center,* No. 1:06CV00209, 2007 WL 1074663, at *7 (M.D.N.C. Apr. 4, 2007) ("without express guidance from the North Carolina courts or legislature, the court will not expand the public policy exception to the at-will employment doctrine to cover FMLA violations."); and then citing *Brewer v. Jefferson–Pilot Standard Life Ins. Co.,* 333 F.Supp.2d 433, 438–39

---

[11] Although NCEEPA does not define "handicap," North Carolina courts routinely substitute the North Carolina Persons with Disabilities Protection Act's ("NCPDPA") definition of disability. *Sossamon v. Granville-Vance Dist. Health Dep't*, 232 N.C. App. 522, 2014 WL 636359, at 6 (N.C. Ct. App. Feb. 18, 2014) (quoting *McCullough v. Branch Banking & Trust Co., Inc.,* 136 N.C. App. 340, 347 (2000)); *see also Simmons v. Chemol Corp.,* 137 N.C. App. 319, 322 (2000). Under NCPDPA, a disabled person is one who "who (i) has a physical or mental impairment which substantially limits one or more major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." *Rishel v. Nationwide Mut. Ins. Co.*, 297 F. Supp. 2d 854, 875 (M.D.N.C. 2003) (quoting N.C. Gen. Stat. § 168A–3(7a)) (internal quotations omitted). "Major life activities" under the NCPDPA includes working. N.C. Gen. Stat. § 168A–3(7a)(c). However, the statute excludes conditions that are "temporary in nature, lasting six months or fewer …" § 168A–3(7a*)*. Critically, Stroud has neither alleged that she is disabled within the meaning § 168A-3 nor has she alleged that her anxiety—unlike her lupus—was anything more than a temporary condition triggered by interpersonal conflict with Franklin. Indeed, Stroud expressly stated she could fully perform her job, so long as she was reassigned to a different supervisor. Doc. No. 50-1 at 37. And she cites no North Carolina authority suggesting that, contrary to federal ADA precedent, a personality conflict with a supervisor can form the basis of a disability claim under the NCPDPA.

(M.D.N.C. 2004) ("[T]his Court declines to hold that a violation of the FMLA creates a public policy exception to at-will employment."); and then citing *Buser v. Southern Food Service, Inc.,* 73 F. Supp. 2d 556, 566–67 (M.D.N.C.1999) ("While discharging an employee who has taken a valid leave of absence pursuant to the FMLA raises serious concerns ..., the Court nonetheless declines to hold, in the absence of North Carolina precedent, that this rises to the level of a public policy concern to justify creating a new and distinct Coman claim.")). *See also Schuler v. Branch Banking & Tr. Co.,* No. CIV. 1:08CV378, 2009 WL 3261665 (W.D.N.C. Oct. 8, 2009). Because persuasive authority holds that violations of the FMLA do not create a public policy exception to at-will employment, and because Stroud's ADA theories cannot supply the necessary public policy predicate, Coca-Cola is entitled to summary judgment on this claim.

### H. Intentional Infliction of Emotional Stress

In her eighth claim, Stroud alleges that Coca-Cola intentionally inflicted emotional distress and caused her anxiety when her manager made rude comments to her, required her to adhere to company policies that previous managers had not strictly enforced, and failed to assign her to a new manager despite her requests.

In North Carolina, a claim for intentional infliction of emotional distress ("IIED") requires "(1) extreme and outrageous conduct by the defendant[,] (2) which is intended to and does in fact cause (3) severe emotional distress." *McPherson v. Employment Source, Inc.*, 827 F. Supp. 3d 668, 706 (E.D.N.C. 2026) (quoting *Waddle v. Sparks*, 331 N.C. 73, 82 (1992)) (internal quotations and additional citations omitted).

Conduct is considered extreme and outrageous only when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Hogan v. Forsyth Country*

*Club Co.*, 79 N.C. App. 483 (1986)); *see Clark v. Clark*, 280 N.C. App. 384, 397 (2021) (explaining that harassing and stalking an ex after a separation, scaring them by stating that "[w]e are going to continue doing everything in our power to make your life miserable," and posting advertisements and photographs online containing personal information sufficed as extreme and outrageous behavior). However, "liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Chidnese v. Chidnese*, 210 N.C. App. 299, 316 (2011) (quoting *Briggs v. Rosenthal,* 73 N.C. App. 672, 677 (1985)) (additional citation omitted). Likewise, a "termination … in violation of federal law … does not necessarily constitute extreme and outrageous conduct" in North Carolina. *Efird v. Riley*, 342 F. Supp. 2d 413, 427 (M.D.N.C. 2004).

Rather, "[u]nder North Carolina law, it is extremely rare to find conduct in the employment context that rises to the level of outrageousness necessary to support an IIED claim." *McPherson*, 827 F. Supp. 3d at 706–07 (quoting *Miller v. Gerber Collision (Ne.), Inc.,* No. 4:19-CV-18, 2019 WL 2527105, at *3 (E.D.N.C. June 19, 2019)) (collecting cases); *see Hogan*, 79 N.C. App. at 493-94 (conduct not extreme and outrageous where a supervisor screamed at two employees, called them names, cursed at them, disrupted their work, threw menus at them, refused to grant pregnancy leave, and terminated an employee who left work due to labor pains). And, in those cases where North Carolina courts *have* "found IIED claims actionable, the conduct has been extremely egregious, involving sexual advances, obscene language, and inappropriate touching." *Id.* (collecting cases). *See Watson v. Dixon,* 130 N.C. App. 47 (1998), *on reh'g,* 132 N.C. App. 329 (1999), *writ allowed, review on additional issues denied,* 351 N.C. 191 (1999), and *aff'd,* 352 N.C. 343 (2000) (extreme and outrageous conduct where Defendant scared and humiliated Plaintiff over

28

an eight month period with cruel practical jokes which quickly escalated into obscene comments, sexual misconduct with unwanted touching, and threats to Plaintiff's personal safety).

Here, Stroud clearly has not asserted facts that demonstrate Defendant engaged in extreme and outrageous conduct under North Carolina law, and the Court will grant Defendant's motion for summary judgment on this claim.

## I. Retaliation under REDA

Finally, Stroud last alleges that Defendant retaliated against her in violation of REDA. REDA provides that no person "shall discriminate or take any retaliatory action against an employee because the employee in good faith does or threatens to do" one of a series of actions described by the statute. N.C. Gen. Stat. § 95-241(a). To prevail on a REDA claim, a plaintiff must show: "(1) that [s]he exercised h[er] rights as listed under N.C. Gen. Stat. § 95-241(a), (2) that [s]he suffered an adverse employment action, and (3) that the alleged retaliatory action was taken because the employee exercised h[er] rights under N.C. Gen. Stat. § 95-241(a)." *Wiley v. United Parcel Serv., Inc.*, 164 N.C. App. 183, 186 (2004). However, before asserting a REDA claim, a plaintiff must: (1) "file a written complaint with the [North Carolina] Commissioner of Labor alleging [a REDA] violation"; (2) "obtain a right-to-sue letter"; and (3) "commence a civil action within ninety days of the letter's issuance." *Driskell v. Summit Contracting Grp., Inc.*, 828 F. App'x 858, 868–69 (4th Cir. 2020); N.C. Gen. Stat. §§ 95-242(a); 95-243(a)–(b).

Here, Stroud has not alleged that she ever filed a complaint with the Commissioner of Labor. Nor has she refuted Defendant's contention that she is barred from pursuing claims under REDA as a result of this failure. Accordingly, Stroud has failed to exhaust her administrative remedies, and her REDA claim must be dismissed for lack of subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1); *Hudson v. Volunteers of Am. of Carolinas,* No. 5:18-CV-191-FL, 2019 WL

1767564, at *4 (E.D.N.C. Apr. 22, 2019) (dismissing REDA claim for lack of subject matter jurisdiction where the plaintiff failed to exhaust their administrative remedies). Likewise, to the extent that Stroud alleges wrongful termination in violation of REDA, *see* Doc. No. 1 ¶ 70, that claim also fails because Stroud has not asserted any facts suggesting that she engaged in any of the enumerated activities protected under REDA. *See* N.C. Gen. Stat. § 95-241(a).

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1.  Defendant's Motion for Summary Judgment (Doc. No. 50) is **GRANTED** in part and **DENIED** in part as set forth above; and

2.  This case shall **proceed toward trial on the merits on the single remaining claim** in the absence of a voluntary resolution of the dispute among the parties.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: August 4, 2026

Kenneth D. Bell
United States District Judge

30